Our next case is the case of Susan Haas v. 3M Company, et al. Mr. Placitella. Yes, Your Honor. Thank you. Good afternoon, Your Honors. Good afternoon. This appeal focuses primarily on the District Court's failure to consider important facts and how those facts need to relate. Do you want to reserve some time for me? Yes, I'm sorry, Your Honor. I do have three minutes. That request will be granted. How those important facts interrelate with other legitimate proof. And so doing the court really then did not give the plaintiff the benefit of all legitimate references to the complete record. In this case, the court's decision was based primarily on the ruling that Carl Brassner, the then plaintiff, testimony that he believed he was exposed to asbestos was not fact-based, but rather based on some unverified assumption. And you can take it as a given, Mr. Placitella, that we've spent some time with your briefing and everything. You like the ruling of the District Court insofar as the court said the deposition of Mr. Brassner comes in, right? I mean, you think that's absolutely the correct decision on that point, correct? I do, Your Honor. Okay. Now, let me ask you, if the best or one of the common defenses that co-defendants will resort to in an asbestos case is to point the finger to the people on either side of them, why was it appropriate for the District Court in this instance to say that Boeing's interests were aligned with GE's interests? That's the question, and there's three answers to that. One, this case, and it's not clear in the papers, by the way, but this case arose in the Middlesex County Superior Court. That's when the deposition was taken. The procedure in the Middlesex County Superior Court is that the co-defendants actually elect somebody to start the deposition and ask the general questions on everyone's behalf, and then if all the questions are not answered, then the other co-defendants are able to supplement. So they get together and come up with a plan for the deposition. That's one. Two, Boeing, because it was sued as a supplier of all the asbestos on the plane, had the exact identical interest that GE did. Well, when you say it was the exact identical one, and I don't know why, as the last argument indicates, I'm not always clear on why lawyers choose to argue things they argue and not to argue other things, and I'm not pretending that I understand it better. I just sometimes don't get it. For whatever reason, Boeing took the position that, yeah, we had asbestos in there. We had asbestos all over the place in there, but we had to have it because the government made us do it. It was the government that made us do the defense. GE did not take that attack. I think in their briefing they indicate that if this goes back, they're going to take that attack, but they didn't. Well, that's correct. Right? That's correct. So when you say their interests are aligned, doesn't the fact that they just took different defense positions tell you they're not aligned? No. Boeing saying, it's all over in there, our stuff's all over in there, the government made us do it. GE saying, not taking that attack. No, because Boeing, although it did take the argument because they thought that was its strongest argument, ultimately, if they lose that argument, they still stand before a jury as a supplier of asbestos on that plane. But they did take that argument. That was an argument they made. Right. But in the context of defending a case, they're in the exact same position. That is, if there's no asbestos on the General Electric engine, then Boeing can't be responsible for the asbestos on the General Electric engine. It's clear. And the mere fact that they say they filed a cross-claim somehow makes this different is of no merit because a cross-claim could also mean if I'm responsible, so are you. So they make a big deal on their brief about, well, I filed a cross-claim. But the cross-claim could mean nothing. The cross-claim just means if I have to pay, so do you. It could be on the exact same theory, only as a different place in the chain of distribution. But the big problem in this case is that the court refused to consider independent proof beyond Mr. Blassner's own testimony. The court never even cited. What independent proof did the court not cite? Yes, Your Honor, there was a deposition taken of a GE corporate representative that was brought to the attention of the district court. The GE corporate representative, I could almost try my entire case without Mr. Blassner based upon that, yet it was never considered. This is what the corporate representative said. Yes, there was asbestos. In fact, there was probably approximately 150 asbestos component parts on our engine. The corporate representative said that the asbestos clamps and gaskets deteriorated, frayed, and wore out. He actually said in his deposition, although this was not made clear in our brief, he actually says in his deposition that the asbestos gaskets and clamps were replaced in the presence of the crew chief and the assistant crew chief, that's who Mr. Blassner was when working on the flight line. He also said when asked did he have an opinion as to whether Mr. Blassner could be exposed to asbestos from a GE engine, he actually said if Blassner was working up under the engine, when an engine mechanic was working there, he could very well have been exposed to asbestos. That's Appendix 139. Materially, and this is, I apologize, not in our brief as a point, but he was asked point blank, have you read Mr. Blassner's deposition? He said, yes, I read it word for word. He was asked, is there anything in there that's not accurate? He said, no. His quote was, I can't say what he said was inaccurate in any way or any means. So the fact that the court said somehow that Mr. Blassner's testimony was speculative was totally taken away by General Electric's own court representative. The court also didn't look at all about the testimony about the manual. There's a manual that applies to this engine, and the manual sets forth the asbestos-containing components supplied by General Electric. Mr. Placitella, I understand your position on that, and I understand that testimony. But as I understand this case, this is before us, and we're looking at this, we're in the same shoes as the district court was, and the district court grants summary judgments. Your problem is we have to decide this case under New Jersey law. Correct. New Jersey law in a product liability case requires that there be some frequency, regularity, and proximity. And proximity is short-lived in a way to say, at least I look at it this way, was the asbestos that was put in that engine by General Electric the proximate cause of Mr. Blassner contracting mesothelioma when he was a crew chief on that plane? Sure. That's the issue. That is the issue. And what's the testimony that establishes that that asbestos was the proximate cause? Well, we have the testimony I just went through establishing that there was asbestos. I understand that. Okay. Then we have even the court acknowledges at page three of the decision, the decedent's primary responsibilities included inspecting and replacing seals and gaskets. The seals and gaskets were asbestos. Mr. Blassner also testified that there was asbestos in the seals and gaskets. Correct. Okay. Mr. Blassner also testified at Appendix 246 and 242 that it was his job to check the seals and the gaskets every day. Every day. Was there testimony in the record that these planes that he was working on had been in service long enough that they were likely to have had replacement parts put in them? The record is vague on that, but there is testimony in the record, especially if you look at the manual that shows that the replacement parts or most of the replacement asbestos parts are GE parts. Now, they try to come at that a different way, but the testimony is there. And I take it there's no testimony that is exposed at any other point in time. Is that correct? And that's a point I wanted to make, Your Honor, which is in this record there are three very important things. One, he had mesothelioma. Two, it's only caused by asbestos. There is no evidence to the contrary. Three, there is no safe threshold. And four, no defendant has pointed to any other proof of any other exposure other than working on these jets. Now, we thought it was also brakes, but the court ruled that out. They said, well, you know what? When we looked at all the evidence, there is no asbestos in the brakes. You might have thought there was, but there isn't. So then the only asbestos left is on the engine. It doesn't do any good in this case. The only defendant left is General Motors, and General Motors didn't do the brakes. That's General Electric. No, that's the beauty of it for us, Your Honor. General Electric did the engine. Correct. The only asbestos left in the case and the only exposure that has not been excluded up to this point. So the only exposure that's left in this case is General Electric's exposure. Now, his testimony, I believe, was yes, sir, it was part of what I checked every day when I did an inspection. Correct. Okay. He was checking the engine. And, you know, his testimony in different parts talked about checking the engine. Some of it was visual. He looked to see to make sure there were no burrs or whatever stuck in the engine. The other part was you take it off, you took off the doors, the covers, and you looked up in the engine. But he didn't testify that every day he looked at the gaskets or the seals. You might visually look at that, but you don't take them apart. No, he didn't take them apart every day. He said that he checked the gaskets and seals every day. But checking them would be, he would look at the gaskets and the seals from various points. That's quite possible. Below the engine. He also testified that he was in the vicinity of when they were changed, at times, not always. In the vicinity. And the GE corporate representative on his own said that crew chiefs and assistant crew chiefs, when gaskets and seals and clamps were changed on the flight line, not in the hangar, the crew chiefs would be in the vicinity. Within 10 feet, I think he said. Mr. Brasmer described working on a particular component, and I wonder if you could tell me what it is that you understood him to be talking about. He said it was a big silver aluminum seal that encased an aluminum component of the engine, and I'm looking at appendix 328. Do you know what part of the, what he was discussing there? It was actually, if you look at the General Electric's corporate rep deposition, and I can give you the site, he cites the same actual component. He calls it a blanket. Mr. Gasket calls it a seal. But if you read the description, it's almost identical. The GE representative said that that often tore, that he got complaints from the crew chiefs like Mr. Brasmer. He was equivocal, however, to be candid, as to whether that was asbestos or fiberglass, although he did say that when it ripped apart, you could see fibers. I would respectfully submit that in the context of a trial, you don't see fibers and fiberglass. You see fibers with asbestos. But that is equivocal, but that's what I think he was talking about. But really, if you look at the description, they're talking about the same exact part. Thank you. Now, there was testimony about, Mr. Brasmer's testimony was that dust fell on his hand and shirt when he opened up the panel to check the engine. Right.  I'm sorry. Is that enough to be proximate, Gus? It is in the context of this is now when you get to the expert's testimony. If these gaskets and these cushions and these seals are on it, think about it. It's a jet engine. High heat. Tremendous vibrations. Right. In addition to whatever maintenance activities are contaminating that compartment. It's just logical, never mind that the expert said that based upon this information, that information, don't forget the General Electric's own corporate representative said that these products deteriorate, wear out, and they deteriorate. It's logical for a jury to conclude that with the high heat and the vibration, when somebody opens up that compartment, part of what that dust is getting there is going to the asbestos-containing dust. That's part of Mr. Thompson's affidavit. It was not considered by the court because the court said that Mr. Thompson's affidavit wasn't fact-based, which is actually wrong. When you say it wasn't considered by the court, the court considered and said they thought Mr. Thompson's testimony was vague and not sufficient to get your point up over the summary judgment. I mean, that's the kind of thing, even at the summary judgment stage, where a district court needs to make almost a Daubert kind of analysis, right, to say there's going to be, there's enough there, isn't that incumbent on the court to make a measurement like that? They might when a Daubert challenge is given, but this is what happened. The court said, quote, Mr. Thompson's report does not state what specific components would have contained asbestos. That's just not true. First of all, Mr. Thompson is an aviation mechanic from 1961 forward. He relied upon the very manual that the GE corporate representative testified about, and he also reviewed the GE corporate representative testimony. And what Mr. Thompson says, even though the district court says that Mr. Thompson never said what asbestos caused the exposure, he states very clearly in paragraph 8 of the certification that the gaskets and clamps contained asbestos, and the court just missed it, frankly. So if you take all that information, he has the right, given the basis of his experience, to say, given the fact that the asbestos is frayed, that it wears out, that it's on the outside, that it's subject to high heat and vibration, that that caused exposure inside a compartment. All right. Yeah. Mr. Blasatella, we'll have you back under bar. Thank you for your time. Thank you very much. And we'll hear from Ms. Wood. On behalf of General Electric, not General Motors. Thank you, Your Honor. May it please the court, I think I'll start by talking about the insufficiency of proof here and then move to the question of the admissibility of Mr. Brassmer's deposition transcript. The district court's decision should be affirmed here. She looked at the entire record and really showed that under the New Jersey's well-established test, that there was no frequent, regular, and proximate contact between Mr. Brassmer and R.G. Isn't that test lower in a mesothelioma case? Don't you have to deal with the Couric case, which kind of pulled the bar down from what Schultes had established as the frequency, regularity, and proximity test? Yeah. The Couric case, I think, does fairly say that it is a flexible test under New Jersey law and that the burden may be somewhat lower in mesothelioma cases because the degree of contact might be a bit lower to establish the medical causation. But if I could go to the facts of Couric, I think it's very interesting and important there because even in a mesothelioma case, Couric was quite clear that the plaintiff must still prove that the source of asbestos was the asbestos-containing product of a particular defendant. And the facts there were quite different from us. And even in that case, there was considerable contact between the plaintiff and asbestos fibers that were going through the air that were much more plentiful than in our case. There's alleged to be considerable contact here. There's the statements of Mr. Brasmer. There are the statements of Gene Davis, GE's corporate representative. There's Mr. Thompson's affidavit, all of which could, taken together, be understood to say, hey, GE made these engines. GE put asbestos into these engines. Whether the government made them or not, they're in there. And they wear out over time. And he was working on the engines and working on them on a regular basis, and he was exposed to it. Why isn't, under Couric, that enough to get in front of a jury? Well, because the degree of exposure in Couric was different in kind. And let me kind of go through the different parts of that. The first problem here is that, as your Honor points out, GE supplies these engines. These are massive engines. And from third parties, GE gets these clamps and these gaskets that are put into those that contain asbestos as initially delivered pursuant to Navy and to Air Force qualifications. The problem is that there are additional asbestos-containing components that also go into those engines after delivery. So there's additional parts that go in there. There's additional clamps. And Mr. Davis' testimony was quite clear about that,  Is the position that GE is taking that to have a mesothelioma products liability case that you could get in front of a jury, a plaintiff would need to be able to identify, it was clamp number B73 that got me. It was B73. Or is it enough for the complainant to say, you know what? GE made the engine. GE put asbestos into the engine. I was exposed to those engine compartments every day in my ordinary job. I ought to get in front of a jury. We certainly don't argue that they have to specify the clamp. Our position is quite different in important ways that I'll try to explain. And one of the important parts of this is that the dust that Mr. Brassner said that he saw when he opened these components, it's not at all clear in this record, even taking inferences in his favor, that that dust was asbestos dust. These are warplane engines. There's napalm in them. There's lime in them. I thought one of the experts testified that it was likely that that was asbestos dust. Even if we credit that, that it's possible that some of the ‑‑ We have to credit it. In summary, Judge, we've got to credit it. And even if we credit that, it was very vague about what gaskets and what clamps there would be, and there's testimony from Mr. Davis. So does Mr. Thompson have to identify the clamp? Even if Mr. Brassner doesn't, does the expert have to say it was the clamp B25? I don't think with that level of specificity, Your Honor, but we also have evidence that by the time these planes with these jet engines were in use and at the time that Mr. Brassner had contact with them, these gaskets and these clamps give out over time. And so there's a significant inference that it was not even all parts by the time he had contact. Where does that kind of inference fall, Ms. Wood? Because at some point, right, your argument, there's a threshold that you have to get past where a rational jury could find for the plaintiff. Once you get above that threshold, then it's for the jury to decide which inference it wants to take, who it believes and doesn't believe, what it thinks is the most logical conclusion. Right now, the only thing that's in front of us is, was there enough here to get above that, a rational jury could look at this question, right? So the question, since you've chosen to put the deposition to the back for the moment, is assuming the deposition's in, Mr. Davis' testimony is in, and Mr. Thompson's testimony is in, you take all those things together, what is it that's lacking that would make it irrational for a jury to say, there's a guy who's working on the parts, he's working on the engine, he's working on them regularly, there's asbestos in there, it's friable asbestos, we've got expert testimony saying it's going to be friable asbestos when he opens it up, and we've got a corporate representative that's acknowledging that that asbestos is going to break down. Why isn't that enough to at least get in front of a jury? I mean, I think there's several problems with that. That fact pattern, even as described, is quite different than the New Jersey cases we have where there's been sufficient proximate cause found. I mean, in those cases, like the Petita case, even if you consider that unpublished decision, that's the pizza box case where you have, over the course of a couple of summers, 25 times a day, there's undisputed evidence that the plaintiff was opening up this box and having asbestos in his face. So in our case, there's removal from that, and there was also testimony that half of those boxes were made by the defendant in question. In our case, it's far removed for a number of different reasons. First of all, there's a question whether or not the dust was itself asbestos or something else that he saw on those, and I think the language that he used was not much when he opened those, so there's a frequency question. We don't know how often he opened these components. He worked on these engines for four years. Not four years, Your Honor. I mean, I think it was from 1972 to 1973 in Vietnam, and he didn't work on the engines, and that's a critical point to remember is that he wasn't. Was it just in Vietnam? Wasn't it in Thailand? Wasn't it in the Air Force Base? In Thailand and in Vietnam and also in stateside, but his job was not an engine specialist, and I think the record is quite clear here that his job at most was to open these panels. There was grime. His witness, Mr. Deaver, our witness, Mr. Davis, who also experienced these same kind of panels, said they never saw dust. What they saw was the grime that you would expect from wartime theater. I mean, when you put Mr. Deaver into the mix, two things occur to me. One is that the district court seemed to be pretty confused about what Mr. Deaver said because it looked like there were a number of places where things were attributed to Mr. Deaver which aren't supported by the record, but most significantly, Mr. Deaver seemed to say, in effect, you know, I wasn't around Mr. Brasmer very darn much, and I don't know what he was doing. So what Mr. Deaver's experience was might have some relevance, but does it rebut Mr. Brasmer's testimony of his own experience in a way that would make it irrational for a jury to find that Mr. Brasmer was credible? I mean, I think even reading Mr. I think it gives background and context to what was going on with crew chiefs in a similar time and place, but even looking at Mr. Brasmer's testimony on its face, it's not at all clear the degree of frequency with which he actually, you know, looked inside or had any direct contact. He wasn't working directly on these engine parts. But it just didn't matter that much because of the nature of the illness that he contracted, correct? If there was sufficient proof of frequency. And if I could move to our second question, I mean, that's part of the problem is that we never had an opportunity to ask our own questions at his deposition. You know, the deposition, unfortunately, was very painful for everyone. It was cut off before we had a chance to go forward and ask specific questions that might have given a little more granularity to the degree of his contact. But Boeing asks a lot of your questions. I mean, they ask significant questions about the frequency of his contact with the engine and the parts in the engine. They asked a number of leading questions that our counsel objected to, and there really was not enough information there. We would have asked follow-up questions with respect to trying to understand. There was a lot of confusion, as I read his deposition, when he's talking about his contact with different parts of the engine, whether he's talking about his work on the brakes, which Mr. Deaver thinks was the cause of his mesothelioma, or whether he's talking about the engine when he's talking about these seals. I mean, there's really nothing that I read in this record that shows that we had anything to do with the seals. Those were provided after GE supplied these engines. Can you speak to the argument made by Mr. Placitella that there's something to be understood from the context of the deposition being taken under New Jersey state rules, under which the defense team agrees on a lead to ask questions on behalf of everybody? I wish I could. I wish they'd put it in their brief. It's the first that I have heard of that, Your Honor. I was not personally at that deposition. But I think even as I heard him describe it under his own lights, the way in which that process would work if it did occur, assuming for the sake of argument, is that the individual defendants would still have their turn at the end to ask anything that was different. And that's what's lacking here, even under his theory. How about addressing another point that they raised in their brief that they didn't talk about today? I think they raised the fact that you needed to take a cross-appeal if you wanted to challenge the admission of this deposition testimony. Yeah, they raised that in their reply brief. And we think that's wrong for a couple of reasons. I think it's well-established by this Court's cases. I'm looking, for example, at United States v. Ritter at 416 F. 3rd, 256. It's well-established that the prevailing party below, and that's us, need not cross-appeal to entitle him to support the judgment in his favor on grounds expressly rejected by the court below. So as long as we're not seeking to enlarge the relief and we want summary judgment on all grounds, but we're simply debating the logic of the district court in getting to that end, that's fairly subsumed as we understand the case law. I know there's also an interesting case from the Seventh Circuit called Jordan v. Stuffin-Phelps at 815 F. 2nd, 429, that even says that these sort of prophylactic cross-appeals where all you're doing is challenging the reasoning of the district court are worse than unnecessary is what the court calls them because it just makes for more briefing for everybody to read, and the better course is to just deal with that reasoning in the course of the normal briefing schedule. So we think that the question of Mr. Brassner's testimony, they certainly put it at issue. It was certainly part of the district court's decision below. We certainly pressed the issue below, and so we think it's fairly considered here. Now you say in Note 13 of your answering brief on page 39 that the plaintiffs do not press Federal Rule of Evidence 807 as a basis, but the district court did in part rely on that, and in their reply brief they certainly do make the argument, so it appears that... Here we are. Yeah, here we are. So 807 is in the mix, isn't it? As a basis, as a foundation. I think it is at this point. We're certainly happy to look at that, and I think as we pointed out in that footnote, that is the residual here is the exception, as your honors are aware, and this court has cases which have really disfavored using that in the normal course, and I think as I read the record below, the district court just simply didn't reach the question. The plaintiffs didn't raise it in their opening brief. They've raised it in their reply, and even if you reach it, I think the elements there are not met, and it takes you smack dab into the question, very similar to the question that we have in 804, of was there a fair opportunity for questioning. So I'm not sure it gives you anything more than that. Well, doesn't it? I mean, it certainly would. I ought to give you more would be superfluous, right? Correct. Right? So it's not superfluous, and by your assertion, what 807 requires is guarantees of trustworthiness and exceptional circumstances. Yes. Isn't it an exceptional circumstance that you've got a mesothelioma patient who dies on you before everybody gets a chance to ask their questions and therefore is unavailable, and isn't it a sufficient guarantee of trustworthiness that everybody's in the room and has an opportunity to raise objections or questions if they think something's being said or done which impairs the trustworthiness, as indeed happened when there was a day when things didn't go forward because he was medicated and people said, we can't go forward? Yeah. I mean, I think if we're going to look at 807, which really hasn't been part of this case, frankly, until the reply brief of the plaintiffs, but if we go there, I think it opens the door of looking at the competency. Well, just so we say it wasn't part of this case. The district court made it part of the case. It's in the district court's opinion. You can read her statement as saying, you know, being equivocal, but it's in there because the district court put it in there, right? I read her as not reaching that, and I don't mean to linger on that point. I think the more important point is that if you then look at the actual requirements of Rule 807 and you look at guarantees of trustworthiness, I think it brings us right back into the question of the competency. This was a very difficult deposition. We have a record that's created from day one of this deposition, even setting aside the problem with day two, that this is a Mr. Brassner was in extreme pain. He was very ill. He's a paranoid schizophrenic. He was on a number of different medications. And if you read through the deposition, as I read it, it's quite confused in places. But, Ms. Wood, isn't the fact that everybody was there and could in fact point out when they thought, we've gotten to a point where this is not trustworthy significant? Because, indeed, they did hit that point, and they did stop the deposition midway through it until the medication issue could be addressed. Doesn't the actual factual background here lend more credibility, not less, to the trustworthiness because people were on the scene, capable of assessing it, did assess it, and in fact halted it at one point? Well, I think what they did at the time was preserve an objection that they were worried about the whole thing. And I don't think they were adjudicating. They didn't call the court. There was some discussion about whether they would at different points. But nobody's adjudicating at that stage the competency of the testimony. They're putting their objections in, which I read, you know, starting out that deposition to cover the whole thing, that there's a problem with, you know, the very sad circumstance that Mr. Brasco was in at that particular point in time. And so I think if you're going to look at a question of resorting, if I can finish my answer, if you can look to resorting to this residual exception for this testimony, it's the antithesis of being trustworthy. And it also throws us back into the problem that we didn't have an opportunity to question it. So I'm not sure it does anything in that respect more than the analysis that we have under 804. And so I think if you throw out Mr. Brasco's testimony because of the hearsay problem, there's really nothing left linking him at all to our engines, and that's a further basis to support affirming the decision of the district court below, and we think the summary judgment should be affirmed. Okay, Ms. Wood. We thank you very much. Thank you. And we'll have Mr. Placitella back on rebuttal. I promise unless there are other questions I won't take my three minutes, and I don't know when we'll get to lunch. In terms of CURAC, it's worth pointing out that in CURAC the plaintiff did not work on the product. It was a deteriorating pipe that he didn't have the knowledge, even that it was asbestos that came from other information just like here. In terms of reliability, here's where we are. We have in these compartments, by GE's own admission, nearly 300 asbestos-containing components that deteriorate and break down in the context of high heat and vibration. And when you want to talk about reliability and why 807 should apply to this case. By the way, you can read this record and say it's remarkable what this man was able to talk about, given his circumstance. He actually remembered the tail numbers of some of these planes. Forty years later. Right. It was remarkable. So to say that he was at it the whole time and that trustworthy. And by the way, when he did not know, he didn't say I know because. He said I make an assumption because he was an honest man. He knew what he was saying. He had the fortitude of knowing the implications of his words were. But was it reliable given the detail he gave? And at the end of the day, and I said I could put the corporate representative for General Electric on the stand and cross-examine him for three hours and almost sit down in a trial. At the end of the day, the corporate representative was asked a question. Did you read Mr. Grassman's deposition or did you just skim it? No, I didn't just skim it. I read it word for word. And his quote was, I can't say what he said was inaccurate in any way or means, close quote. So for them to say that somehow this is not reliable, their own corporate representative takes no issue with the facts as articulated by Mr. Grassman even under very extreme circumstances. And hopefully I'm under my three minutes on the show of questions. You are. Well, thank you very much, Mr. Placitello. And we thank both counsel for their arguments. And we'll take this matter under its current orders. Thank you, guys.